**No. 1852.**
**Second Circuit Appeal.**

## FLORSHEIM BROS. DRY GOODS CO., LTD., v. PEPPER MERCANTILE CO., ET AL.

(October 17, 1924, Opinion and Decree.)

---

*(Syllabus by the Editor)*

**1. Louisiana Digest, Appeal—Par. 626.**
The appellate court will not disturb the judgment of the trial judge on the credibility of witnesses or the weight of testimony unless clearly erroneous. In this case the weight of evidence did not show that a partnership existed.

Appeal from the Parish of Winn, Hon. R. W. Oglesby, Judge.

This is a suit on an open account.

There was judgment against the firm and E. J. Pepper as prayed for, but the demand against Z. Z. Pepper and L. C. Pepper was rejected.

Plaintiff has appealed.

Judgment affirmed.

Moss & Peters, of Winnfield, attorneys for plaintiff and appellant.

J. C. Pearce, Stubbs, Theus, Grisham &

Thompson, of Monroe, attorneys for defendant and appellee.

PORTER, J.  This is a suit on open account for goods sold, and the contest grows out of the following facts:  In the spring, or early summer, of 1921, there was organized in Sikes, a small railroad village in the Parish of Winn, Louisiana, a mercantile concern under the name of the Pepper Mercantile Company, which was operated a year, or perhaps a little longer, and then failed. During its brief existence, the plaintiff company sold it quite a large amount of goods, and it now sues for a balance of $1,605.00, less a credit of a small quantity of goods which had been seized and sold.

The petition alleges that the defendant firm was composed of Z. Z. Pepper, E. J. Pepper and L. C. Pepper, and prays for judgment in solido against each of these parties.

There was judgment against the firm and E. J. Pepper, as prayed for, but the demand against Z. Z. Pepper and L. C. Pepper was rejected, and plaintiff has appealed.

E. J. Pepper is the nephew of Z. Z. Pepper, and L. C. Pepper is his son, who, it appears, was only 20 years old at the time the goods were sold. Z. Z. and L. C. Pepper answered, denying that they were partners in the firm, or had any interest or connection, as partners, with it.

The real contest in the case is over the question whether Z. Z. Pepper was a partner or connected as such with the firm, and the issue as presented to this court is admittedly one of fact solely.

When the defendant firm applied to the plaintiff for a line of credit, one of the members of plaintiff's firm went to the office of R. G. Dun & Co., of Shreveport, and was shown a statement made out by a member of the defendant firm, for the purpose of securing a credit rating by Dun & Co. It appears that Z. Z. Pepper had previously done business with plaintiff's firm, and was known to its representative, seeking the information.  The said statement gave, among other facts, the members of the firm as Z. Z. Pepper, L. C. Pepper and E. J. Pepper, and was signed "Pepper Mercantile Co., E. J. Pepper". It stated Z. Z. Pepper owned unincumbered land, timber and stock worth $30,000, and E. J. Pepper owned lots and buildings in Sikes worth $1,100.  Plaintiff's representative, at the time, was more or less familiar with the handwriting of Z. Z. Pepper, and being of the opinion that the said statement was made out in his handwriting, willingly extended the credit asked for. It is not contended that there was any written agreement of partnership, and it is clear, we think, that when the suit was filed, the principal ground upon which it was hoped to connect Z. Z. Pepper with the firm, was this statement, coupled with the opinion of its representative that it was in the handwriting of the said Pepper. And, on the first day of the trial, Mr. Florsheim, the representative of the plaintiff referred to, testified positively that such was the case. On the following day, however, having secured the original report from Dun & Co., in the meantime, and having compared it with the handwriting of Z. Z. Pepper, took the stand and frankly testified that his testimony on the previous day was a mistake.

Z. Z. Pepper testified emphatically that he did not authorize the use of his name in the said statement, that he had never seen it, and knew nothing of its existence.

With the R. G. Dun & Co. statement, which shows to be in the handwriting of E. J. Pepper, eliminated as a means of connecting Z. Z. Pepper with the firm, the able counsel for the plaintiff was forced to rely upon other and less conclusive facts and circumstances. These are:  A certain check given by Z. Z. Pepper on, it is alleged, the Pepper Mercantile Co., in payment of a debt which he personally owed; a quantity of coffee—the amount is not

given—which he purchased, and which was subsequently found in the store of the defendant firm; certain statements or admissions which he is alleged to have made to Head, A. J. Crain, Walker, Pucket and R. E. Crain.

Before discussing these matters, it will be well to state some facts admitted by Z. Z. Pepper, who lived about two miles from the village of Sikes, and owned several farms in the vicinity of the one upon which he resided, and conducted a small store or commissary, from which he sold goods, principally, we assume, to his employees. Some time in the early part of 1921, his nephew, E. J. Pepper, applied to him for a loan of $1,000.00 with which to start a store at Sikes, and he agreed to loan his nephew that sum, if the Bank at Winnfield would discount his note. But the Bank would not let him have but $300.00, and his nephew opened the business on this sum and whatever he had in addition, which was probably not much, if anything. His son, L. C. Pepper, worked in the store five or six months.

As stated above, the business lasted about a year, and E. J. Pepper left for parts unknown, leaving nothing behind except a small remnant of the stock of goods, numerous debts, and a reputation as a forger and a swindler. In addition to the $300.00 above mentioned, Z. Z. Pepper let his nephew have 13 bales of cotton, for which he received nothing.

Since we are constrained by the law and the facts to affirm the judgment of the lower court, it will serve no useful purpose to discuss, in any great detail, the facts and circumstances relied up to connect Z. Z. Pepper with the defendant concern. We shall touch lightly upon some of the most important ones.

Z. Z. Pepper states that he bought a lot of coffee for his store or commissary from a Monroe concern, upon the assurance that the price of coffee would go much higher; that immediately afterwards, the price began to decline, and that he sold his nephew a small quantity—he says about $70.00 worth. This was the coffee which was seen in the Pepper Mercantile Co.'s store by the traveling salesman of the house in Monroe, which had sold it, as above stated.

A judgment had been obtained against Z. Z. Pepper on a debt for which he was security for some $429.00, and it was paid by a check on the First National Bank of Winnfield. This check was drawn on a blank form of checks used by the Pepper Mercantile Co., and signed by that concern, by Z. Z. Pepper. As it was filed in evidence, a line is drawn through the words "Pepper Mercantile Co." and Pepper says that, according to his recollection, this was on the check when he signed. The cashier of the Bank, and perhaps another witness, say this was not the case. The only significance attached to the check is, of course, the fact that Pepper's personal debt was paid by a check drawn by the Mercantile Co., and signed by him. The fact as to when and by whom the erasure was made, is not satisfactorily explained, but it is shown, beyond any reasonable doubt, that Z. Z. Pepper applied to Mr. Bailey, President of the Bank at Winnfield, for some money to pay this very judgment, telling Mr. Bailey that he was going to try to raise as much as he could from other sources, and Pepper testifies that he did induce his nephew to let him have $129.00 on what he owed him, and that he got the balance, $300.00, from the Bank, and gave his note for that amount. He then deposited the full amount in the Bank and drew against it—the check in question. He is fully corroborated by Mr. Bailey with reference to the borrowing of $300.00, and the

purpose of it. R. E. Crain, Cashier of the Bank at Sikes, testified that on a certain occasion, Z. Z. Pepper asked him if he would not like to buy his (Pepper's) interest in the Pepper Mercantile Co. Pepper says that the "interest" he referred to was the debt of some $450.00, and 13 bales of cotton which the Company owed him, and that he would have explained the matter fully, but that Crain declared he was not able to buy it, and hence it was not necessary to explain what it was. Crain naturally assumed that what Pepper meant was his interest as a partner, and if Pepper was an educated and trained business man, his explanation would, perhaps, appear less plausible, but we are not prepared to say that, coming from such a man as he appears to be—an inexperienced country farmer, with limited education—his explanation is not unreasonable.

Walter Head testified to a rather long statement which he heard Pepper make to his (Head's) father, to the effect that he (Pepper) had put $1,000.00 and 13 bales of cotton "in there" (in the Mercantile Co.), and it looked like he was going to lose it all, and that his boy, L. C. Pepper, could have managed the business better than E. J. Pepper had done. Z. Z. Pepper denies the statement about putting $1,000.00 and 13 bales of cotton in the business. He does not remember discussing the matter, but admits that he talked to Head's father, and that if he did say anything about the money and cotton, he meant that the business owed him that much, and not that he had put that much in the business as a partner.

George Walker says he heard Z. Z. Pepper say that he had to take $330.00 out of the business to pay off a judgment. (This was the judgment referred to above.) Pepper denies making such a statement. The trial judge believed Pepper, and disbelieved Walker. He knew both parties, and was in a better position than we are to weigh their statements.

A. J. Crain says that Pepper, in discussing the business of Pepper Mercantile Co. on one occasion, referred to it as "our business". Pepper denies this.

Bailey Puckett was placed on the stand by plaintiff's counsel to testify that Z. Z. Pepper employed him to clerk in the store of the defendant concern, and this is, in a modified sense, true. It appears to have happened this way: One afternoon, Pepper was in the store, and his nephew (who was undoubtedly the ostensible head and manager of the business), was in the yard, buying some cotton. Some one, or perhaps several people, wanted to be waited on, and he asked Puckett to attend to them. At the close of the day, Puckett asked if they would need him any longer. This question was addressed to E. J. Pepper, and the latter asked Z. Z. Pepper if he thought they would need him (Puckett) any longer, and Z. Z. Pepper replied that "they" could use him all right. A little later on, he says Z. Z. Pepper told him he would have to see Elisha (E. J. Pepper) and "talked like it was up to Elisha".

It is not surprising that the old man to whom the business owed so much, and who, besides, seems to have been deeply interested in the success of his nephew, should have shown some interest in the management of the concern. Indeed, it would not have been surprising, under the circumstances, if he had exercised more authority than any one testified that he ever, at any time, did.

It is an ancient rule of evidence of the Civil and Common Law that: "Extra-judicial declarations are the weakest species of evidence known to the law." See numer-

ous cases cited in La. Digest, Vol. 3, pages 167 and 165.

To hold Z. Z. Pepper liable in this case would be to convict him, morally, at least, of being a swindler and a perjurer. He cannot be honestly mistaken, while the witnesses referred to may be.

The trial judge, in his written opinion, said:

"Knowing Mr. Pepper as I do, having had legal dealings with him for the past fifteen years, both for and against him, I am convinced that his honor and integrity are of such a high standard that he would not wilfully make a mis-statement of facts even to save the earnings of a life of the hardest kind of work."

The judgment appealed from is affirmed.